UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
───────────────────────────────

SIRIUSPOINT LTD,

                        Plaintiff,

               -v-

JEFFREY W. DAVIS,

                        Defendant.

22-CV-7955 (JPO)

OPINION AND ORDER

J. PAUL OETKEN, District Judge:

Before the Court is Plaintiff SiriusPoint Ltd.'s motion for a preliminary injunction seeking to enjoin the arbitration of a dispute with Defendant Jeffrey Davis regarding whether Davis must repay a portion of a retention award he was paid before his resignation from SiriusPoint — a dispute that is also the subject of this action for breach of contract filed by SiriusPoint. Davis cross-moves to compel arbitration, arguing that, at the very least, the arbitration panel should determine the issue of arbitrability. For the reasons that follow, SiriusPoint's motion for a preliminary injunction is denied and Davis's cross-motion is granted to the extent that the Court concludes that the issue of arbitrability is properly addressed by the arbitration panel.

I.  Background

    A.  Factual Background

SiriusPoint Ltd. ("SiriusPoint") is an insurer with a global business. (*See* ECF No. 12-A.) As explained in greater detail below, SiriusPoint was formed by a merger of Sirius Internal Insurance Group, Ltd. ("Sirius Group") with another firm. Prior to the merger, Defendant Jeffrey W. Davis ("Davis") served as Sirius Group's Executive Vice President, Chief Risk

Officer, and Chief Actuary from 2016 until the merger. After the merger, he continued in those roles until resigning on July 19, 2021. (ECF No. 1 ("Compl.") ¶¶ 10, 20.)

### 1. Retention Award Agreement

On November 25, 2019, Sirius Group President and CEO Kernan V. Oberting emailed Davis soliciting him to sign the Retention Award Agreement ("RAA"). The email stated:

> I am pleased to award you a special cash retention award of 800,000 USD, payable in two installments, 50% on or prior to March 15, 2020 and 50% on or prior to March 15, 2021, in addition to your normal incentive compensation payable for the upcoming performance cycles. The terms of your award are set forth in the attached letter and subject to your agreement to the terms provided therein.

(ECF No. 12-2 ("RAA") at 2.) Davis agreed. The RAA became effective on December 5, 2019. (Compl. ¶ 15.) Sirius Group and SiriusPoint agreed to pay Davis in two installments, 50% on or before March 15, 2020 and 50% on or before March 15, 2021 (the "Vesting Dates"). (RAA at 2.) Sirius Group made the first payment on March 15, 2020, and the second on March 15, 2021. (Compl. ¶ 16.)

The crux of Davis's obligations under the RAA entailed being employed for a certain time; failure to do so was dispositive of Davis's rights under the RAA. The RAA, however, recognized an exception to that general rule: "[i]f [Davis's] employment is terminated for any reason other than . . . **a resignation for Good Reason**, [Davis] will forfeit any unvested portion of the Retention Award." (RAA at 3 (emphasis added).) It further explained that "if such [a resignation without Good Reason] occurs within 12 months" after one of the two Vesting Dates, then Davis would be obligated to pay back the amount paid on that Vesting Date. (*Id.*) Thus, if Davis resigned prior to the termination of his obligations to remain employed there, the RAA provided that liability for repayment of the award would turn on a single question: whether Davis resigned with "Good Reason." The RAA was drafted by Sirius Group and subject to a

2

three-week exploding offer window. (*Id.*) When Sirius Group drafted the RAA, it chose not to define what constitutes "a resignation for Good Reason" but instead expressly incorporated the definition of "Good Reason [] as these terms are defined in the Sirius Group Severance and Change in Control Plan."[1] (*Id.*) The RAA did not include an arbitration clause or any other dispute resolution provision. (ECF No. 11 ("Pl. Memo") at 6.)

### 2. Severance Plan

As part of their ongoing employment relationship, Davis and Sirius Group had previously entered into a contract, the Group Severance and Change in Control Plan (the "Severance Plan" or simply the "Plan"), effective on September 10, 2018. (*See generally* ECF No. 12-4 ("S.P.") § 1.) Sirius Group drafted the Plan, and it was assumed by SiriusPoint post-merger.

There are two key components of the Plan. First, the Plan featured a bespoke "Good Reason" clause, which provided specific conditions satisfying Good Reason in the event of certain conditions, including a "Change in Control":

> "Good Reason" . . . . shall mean the Participant has complied with the Good Reason Process (as defined below) following the occurrence of any of the following conditions (without Participant's written consent or waiver): (i) a material diminution in the Participant's responsibilities, authority or duties, unless such diminution is in connection with a Cause event; . . . . (iii) . . . . during the 24-month period following a Change in Control, a material diminution in the regular target annual long term incentive opportunity or the annual target long-term incentive award subsequently granted to the Participant . . . .

(S.P. § 1(p).)

The Plan also incorporated a "Good Reason Process" clause:

> "Good Reason Process" shall mean that (i) the Participant reasonably determines in good faith that a Good Reason condition

---

[1] The RAA expressly adopted the Severance Plan's definitions of other key terms, such as "Good Cause" and, to a lesser extent, "Existing Incentives." (RAA at 3.)

3

>has occurred; (ii) the Participant notifies the Company in writing of the occurrence of the Good Reason condition within 60 days of the Participant having actual or constructive knowledge of the occurrence of such condition; (iii) the Participant cooperates in good faith with the Company's efforts, for a period not less than 30 days following such notice (the "Cure Period"), to remedy the condition; (iv) notwithstanding such efforts, the Good Reason condition continues to exist; and (v) the Participant terminates Participant's employment at least 10 days, but no more than 60 days, after the end of the Cure Period.

(*Id.*)

The Plan dealt contractually with various legal issues that could arise in the event of a premature termination of the employment relationship, though it was not exhaustive. The rest of the Plan dealt primarily with the employer's duties to employees under the Employee Retirement Income Security Act ("ERISA"). (*See, e.g.*, S.P. §§ 2, 3(a) – 3(b).) The Plan had the same structure as the RAA in that an employee's entitlement to "payments and benefits" post-resignation turns on whether his "termination of [his] Employment" sufficiently "constitutes a . . . resignation for Good Reason." (S.P. § 3(c).)

The second critical component of the Plan is its arbitration agreement. That clause provided that any dispute over the parties' rights and obligations would be subject to arbitration:

>Arbitration; Statute of Limitations. No Claimant may bring any legal action to recover benefits under this Plan until he or she has exhausted the internal administrative claims and appeals process described [in this Agreement]. No legal action may be commenced at all, unless commenced no later than one year following the issuance of a final decision on the claim for benefits, or the expiration of the appeal decision if no decision is issued. . . .Upon Claimant's exhaustion of the provisions set forth above, any Claimant with a continuing dispute arising out of or relating to this Plan or the adoption, breach, termination or validity thereof, will be settled by binding arbitration by a panel of three arbitrators in accordance with the commercial arbitration rules of the American Arbitration Association. The arbitration proceedings will be located in New York City, New York. The arbitrators are not empowered to award damages in excess of compensatory damages and no party shall be entitled to any damages in excess of compensatory

4

>damages.  Judgment upon any arbitration award may be entered into any court having jurisdiction thereof and the parties consent to the jurisdiction of any court of competent jurisdiction located in the State of New York.  **BY PARTICIPATING IN THIS PLAN, PARTICIPANT WAIVES ANY RIGHT THAT PARTICIPANT MAY HAVE TO A JURY TRIAL OR, EXCEPT AS EXPRESSLY PROVIDED HEREIN, A COURT TRIAL OF ANY CLAIM ALLEGED BY PARTICPANT.**

(S.P. § 4(h) (emphasis in original).)  This arbitration provision adopted the commercial arbitration rules of the American Arbitration Association ("AAA").

Prior to the merger, Davis served as Executive Vice President, Chief Risk Officer, and Chief Actuary, and reported to the CEO of Sirius Group.  (Compl. ¶ 13.)  On February 26, 2021, Sirius Group effected a change in control and merged with Third Point Reinsurance, Ltd. ("TPR") to form SiriusPoint, the Plaintiff in this action.  Following the merger, Davis was dissatisfied with his role in the new organization, and he initiated the Good Reason Process on April 22, 2021.  (ECF No. 19 ("Thomas Decl.") ¶ 6, 12; Compl. ¶ 13 – 25.)  SiriusPoint does not contest that Davis complied with the Good Reason Process prior to resigning and initiating arbitration.

On September 15, 2022, Davis filed a Demand for Arbitration with the AAA.  (*See* ECF No. 19-2 ("DFA") ¶ 110.)  The crux of Davis's theory of liability is that he resigned for Good Reason, complied with the Good Reason Process, and so is entitled to the contractual benefits associated with the ERISA provisions in the Severance Plan as well as the full retention award he had been paid under the RAA.  (DFA ¶ 5.)  Davis argued, among other things, that the merger was a "Change in Control" within the meaning of the Severance Plan.  (DFA ¶ 27.)

As to the Good Reason clause, Davis argued that post-merger, five "events caused [him] to experience a material and significant reduction in his responsibilities, authority, and duties, such that he had 'Good Reason' to resign with severance under the terms of the Plan."  (DFA

5

¶ 28 (quoting SP § 1(p)).) First, he argued that the CEO's decision to "split Mr. Davis'[s] roles as Chief Risk Officer and Chief Actuary among two people . . . reduced [his] influence and authority" within the meaning of the Good Reason definition. (DFA ¶ 29.) Second, he argued that a change in the reporting structure — such that "[i]nstead of reporting to the CEO," he reported to the CFO — and his exclusion from the executive leadership team amounted to "material and significant reductions" within the meaning of Good Reason. (DFA ¶¶ 30 – 32.) Third, Davis argued that his "exclu[sion] from" both important interview processes for job applicants and all other "strategic and organizational discussions in which he previously played an active and crucial part" fell within Good Reason. (DFA ¶¶ 34 – 35.) Fourth, Davis cited a specific incident on March 23, 2021, when he was stripped of one of his key deputies in the risk management department, without any input or notice, arguing that this constituted Good Reason. (DFA ¶ 36.) Fifth, he argued that his "responsibilities, authority and duties were . . . diminished with regard to executive management committees," satisfying Good Reason. (DFA ¶¶ 37 – 40.)

Davis demanded arbitration on four counts. Count I, Count II, and Count III are claims under either the ERISA section of the Severance Plan or SiriusPoint's statutory obligations as an ERISA provider.[2] Count IV sought a declaratory judgment resolving a dispute regarding his rights under the RAA. (DFA ¶¶ 102 – 109.) The dispute arose from the fact that in "July 2021, SiriusPoint demanded repayment of the second installment [of the RAA payments] following termination of Mr. Davis' employment" under the clawback provisions of the RAA. (DFA ¶ 106.) Because resolution of Counts I, II, and III would also require the arbitrators to determine

---

[2] Count I is an ERISA claim for benefits under the Plan. (DFA ¶¶ 84 – 89.) Count II is an ERISA claim for fiduciary breach of its obligations under the Severance Plan and as an ERISA provider. (DFA ¶ 90 – 94.) Count III is another ERISA claim alleging illicit interference with a protected right in that SiriusPoint allegedly "manipulat[ed] the employee relationship in order to interfere with rights to employee benefits." (DFA ¶¶ 95 – 101.)

whether his resignation fell within the meaning of Good Reason, Davis likewise asked the arbitrators for "a declaration of the parties' respective rights and duties under the [RAA]" as well as a specific declaration that "Davis resigned for Good Reason and is not required to repay any amount of the Retention Award." (DFA ¶ 109.)

### B. Procedural History

On September 16, 2022, SiriusPoint initiated this action for breach of contract seeking repayment from Davis of $400,000, the amount of its 2021 RAA payment. (*See* Compl. ¶¶ 26 – 32.) On October 10, 2022, SiriusPoint filed a motion seeking a preliminary and permanent injunction against Davis's arbitration of Count IV (the RAA repayment claim). (ECF No. 10.) Davis responded on November 23, 2022, raising two arguments: first, that the terms of the arbitration clause delegated jurisdiction to the arbitrators in the first instance to determine arbitrability; and second, that if the Court determined that the issue of arbitrability was properly before the Court, then it should compel arbitration of the dispute. (Def. Memo at 9 – 16.)

On December 16, 2022, the Court held a telephone conference with the parties at which it reserved decision on the requests for preliminary and permanent injunctive relief. (ECF No. 28 at 12.) Although the minute entry for that conference indicates that a TRO was denied, SiriusPoint never sought a TRO. (*See* ECF No. 28 at 4 – 6.) On January 17, 2023, the arbitration panel opined that it "believes litigating [the] related issues" of Good Reason for RAA and Severance Plan purposes "in separate forums" would result in "unduly complex substantive and procedural issues" and would be "inefficient and unduly costly." (ECF No. 30-1.)

### II. Legal Standards

To obtain a preliminary injunction, the moving party must demonstrate (1) a likelihood of success on the merits or a sufficiently serious question going to the merits to make it fair ground for litigation and that the balance of hardships tips decidedly in favor of the moving party; (2) a

likelihood of irreparable injury; (3) that the balance of hardships tips in plaintiff's favor; and (4) that the preliminary injunction is in the public interest. *See Benihana, Inc. v. Benihana Tokyo, LLC*, 784 F.3d 887, 895 (2d Cir. 2015).

Under the Federal Arbitration Act ("FAA"), written arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Federal courts interpret the FAA to "reflect[] an emphatic federal policy in favor of arbitral dispute resolution." *Marmet Health Care Ct., Inc. v. Brown*, 565 U.S. 530, 533 (2012) (citation omitted). As a general matter, the FAA "establishes a liberal federal policy favoring arbitration agreements." *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1621 (2018) (citation omitted).

When courts are "[a]pplying the [FAA], . . . parties may agree to have an arbitrator decide not only the merits of a particular dispute but also 'gateway questions of arbitrability, such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy.'" *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 529 (2019) (quoting *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 64, 68–69 (2011)). The Supreme Court has "explained that an 'agreement to arbitrate a gateway issue is simply an additional, antecedent agreement the party seeking arbitration asks the federal court to enforce, and the FAA operates on this additional arbitration agreement just as it does on any other.'" *Henry Schein*, 139 S. Ct. at 529 (quoting *Rent–A–Center*, 561 U.S. at 70). To overcome the presumption of adjudication, the party seeking arbitration must show "'[agreement] to be bound' by provisions that '*clearly and unmistakably* allow the arbitrator to determine her own jurisdiction' over an agreement to arbitrate 'whose continued existence and validity is being questioned.'" *Contec Corp. v. Remote Solution. Co., Ltd.*, 398 F.3d 205, 211 (2d Cir. 2005) (quoting *Motorola Credit*

*Corp. v. Uzan*, 388 F.3d 39, 52 (2d Cir. 2004)). If the delegation to the arbitrator is "clearly and unmistakably" established, then a court lacks jurisdiction and, even if it suspects a grievance is patently non-arbitrable, it "'has no business weighing the merits of the grievance' because the 'agreement is to submit all grievances to arbitration, not merely those which the court will deem meritorious.'" *Henry Schein*, 139 S. Ct. at 529 (quoting *AT&T Techs., Inc. v. Commc'ns Workers*, 475 U.S. 643, 649 – 50 (1986)).

**III.    Discussion**

The first requirement for a preliminary injunction is a showing of likelihood of success on the merits or serious questions on the merits as well as that the balance of hardships tilt decidedly in favor of the moving party. Because the Court concludes that SiriusPoint has established neither a likelihood of success nor serious questions on the merits plus hardships tipping decidedly in its favor, it is unnecessary to address the other requirements.

The question raised here is "whether the issue of arbitrability is for [a] court or for [an] arbitrator" to determine in the first instance, on these facts and under these contractual provisions. *Bell v. Cendant Corp.*, 293 F.3d 563, 565—66 (2d Cir. 2002). SiriusPoint is correct that, under Second Circuit law, "the question of arbitrability [is] . . . ordinarily . . . subject to judicial determination rather than arbitration." *Contec Corp. v. Remote Solution. Co., Ltd.*, 398 F.3d 205, 211 (2d Cir. 2005) (internal citation omitted).

However, the Second Circuit recognizes a specific, factual exception to this presumption. Where a party "'agreed to be bound' by provisions that 'clearly and unmistakably allow the arbitrator to determine her own jurisdiction' over an agreement to arbitrate 'whose continued existence and validity is being questioned,' it is the province of the arbitrator to 'decide whether a valid arbitration agreement exists.'" *Id.* at 211 (quoting *Uzan*, 388 F.3d at 52). In applying the "clear and unmistakable" test to resolve a similar dispute, Judge Koeltl recently explained:

9

> Courts in this Circuit have recognized that "when parties explicitly incorporate rules that empower an arbitrator to decide issues of arbitrability," such as the AAA Rules, "the incorporation serves as clear and unmistakable evidence of the parties' intent to delegate such issues to an arbitrator."

*1199SEIU United Healthcare Workers E. v. PSC Cmty. Servs.*, 520 F. Supp. 3d 588, 607 (S.D.N.Y. 2021) (Koeltl, J.) (quoting *Contec Corp.*, 398 F.3d at 208). For the same reasons, here, the dispositive fact is that the arbitration clause expressly adopted the AAA rules, which the Second Circuit has found both necessary and sufficient, as a matter of law, to "provide clear and unmistakable evidence of the parties' intent to arbitrate issues of arbitrability." *Contec*, 398 F.3d at 210. On that rationale, SiriusPoint "cannot now disown its agreed-to obligation to arbitrate *all* disputes, including the question of arbitrability" in the first instance. *Id.* at 211. SiriusPoint does not dispute that this arbitration agreement adopted the commercial arbitration rules of the AAA. Specifically, the Plan incorporated of Rule 7(a) of the AAA Arbitration Rules, which expressly provides that "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim." Am. Arb. Ass'n R. 7(a). SiriusPoint is correct when it argues that the general presumption is that whether a dispute is arbitrable is a matter for the court, not the arbitrator, but, here, Rule 7(a) reverses that presumption. (*See* Pl. Memo at 5.)

SiriusPoint responds to this by arguing that because the RAA itself had no arbitration clause, it is unreasonable to assume that it incorporated the arbitration clause from the Severance Plan, along with its definition of Good Reason. This argument fails. Here, the arbitration clause in the Several Plan mandates arbitration of "*any . . . dispute arising out of or relating to* this Plan or the adoption, breach, termination or validity thereof." (SP § 4(h) (emphasis added).) And under Second Circuit law, this language "is considered 'the paradigm of a broad clause,'" which

10

gives rise to a presumption of arbitrability.  *ADR/JB, Corp. v. MCY III, Inc.*, 299 F. Supp. 2d 110, 114 (E.D.N.Y. 2004) (quoting *Collins & Aikman Prods. Co. v. Bldg. Sys. Inc.*, 58 F.3d 16, 20 (2d Cir. 1995)).

If the Court determines that a particular arbitration clause qualifies as a "broad" arbitration clause, the burden shifts to SiriusPoint, which must establish that the parties' dispute regarding the RAA is "in respect of a matter that, on its face, is clearly collateral to the contract." *ADR/JB*, 299 F. Supp. 2d at 114 (quoting *Collins & Aikman*, 58 F.3d at 23; *ACE Cap. Re Overseas Ltd. v. United Life. Ins. Co.*, 307 F.3d 24, 34 (2d Cir. 2002) (internal quotation marks omitted)).  Here, the language is particularly broad, covering not just disputes that "arise under" the Plan but also disputes that merely "relate to" the Plan.

The RAA is not collateral to the Severance Plan.  The RAA references the Severance Plan and explicitly incorporates its definition of "Good Reason," the term at the center of the parties' dispute in this case.  The Plan also addresses how a Change in Control will affect "any fully-vested annual, long-term, or other *incentive award* . . . ."  (S.P. § 3(a)(ii) (emphasis added).)  SiriusPoint has failed to show that the RAA was collateral to the Severance Plan.

But even if the RAA were collateral to the Severance Plan, that would not help SiriusPoint.  When it has determined that a subsequent agreement is "collateral" to one containing an arbitration clause, the court's job is not over.  It must "next examine[] whether it falls within the scope of the arbitration clause because it implicates the rights and obligations of the parties under the [principal contract]." *ADR/JB*, 299 F. Supp. 2d at 115.  To determine whether it does, "the [c]ourt must 'focus on the factual allegations in the complaint rather than the legal causes of action asserted.  If the allegations underlying the claims 'touch matters' covered by the parties' [principal] agreement, then those claims must be arbitrated, whatever the

11

labels attached to them.'" *Id.* (quoting *Genesco, Inc. v. T. Kakiuchi & Co.*, 815 F.2d 840, 846 (2d Cir. 1987). SiriusPoint's assertion that "Count IV can be resolved by reference to the Retention Award Agreement only, and does not hinge on any application or determination under the Severance Plan" is untrue: this litigation will turn on whether Davis satisfies the definition of Good Reason from the Plan. (Pl. Reply at 6.) Sirius Group's choice to "use expansive language in drafting [the] arbitration clause" requires the Court to "presum[e] that [it] intend[s] all issues that 'touch matters' within the main agreement to be arbitrated.'" *ADR/JB*, 299 F. Supp. 2d at 114 – 15 (quoting *Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc.*, 252 F.3d 218, 225 (2d Cir. 2001)).

The Court concludes that the parties agreed to arbitrate, at the very least, the issue of arbitrability of this dispute. SiriusPoint has not shown a likelihood of success on its motion to preliminary enjoin the arbitration, nor has it shown serious questions going to the merits plus a balance of hardships tipping decidedly in its favor. Accordingly, its motion must be denied. And for the same reasons, Davis's motion to compel arbitration is granted to the extent that the arbitration panel will determine the issue of arbitrability.

## IV.    Conclusion

For the foregoing reasons, Plaintiff SiriusPoint Ltd.'s motion for a preliminary injunction enjoining the arbitration of Count IV is DENIED; Defendant Davis's cross-motion to compel arbitration is GRANTED to the extent that the Court orders SiriusPoint to participate in the arbitration proceedings on the threshold question of arbitrability of this dispute.

This case will be stayed pending arbitration. The parties shall file a status letter within 14 days after any pertinent decision or award in the arbitration, and in any event no later than November 15, 2023.

The Clerk of Court is directed to close the motions at ECF Numbers 10 and 18 and to mark this case as stayed.

SO ORDERED.

Dated: July 11, 2023
New York, New York

_____
J. PAUL OETKEN
United States District Judge